UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


MICHAEL GRAY,

      Plaintiff,

v.                                    Civil Action No. 2:23-cv-00569

HERITAGE-CRYSTAL CLEAN, LLC,

      Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is defendant's motion for summary judgment on (1) plaintiff's claims against it under the West Virginia Human Rights Act ("WVHRA") and (2) defendant's counterclaim against plaintiff for breach of loyalty.  The motions were filed together with a supporting memorandum on July 12, 2024.  ECF 35 and 36.  Plaintiff opposes the motion by response filed July 27, 2024, ECF 39, to which defendant replied on August 2, 2024, ECF 44.


I.    <u>Background</u>


      This action concerns the termination of plaintiff's employment by defendant, which plaintiff alleges was discriminatory and retaliatory on the bases of age and disability.  Defendant contends that plaintiff violated company

1

policy, by virtue of which it had legitimate, nondiscriminatory reasons to terminate plaintiff.  Plaintiff asserts that defendant's reasons were pretextual for its unlawful discriminatory termination of plaintiff.

Plaintiff's employment with defendant began in 2011 as a branch sales manager until his promotion in 2012 to his final role as the branch manager of defendant's Charleston, West Virginia branch.  Pl. Dep. 22:5, 24:12-22, 25:9-11.  Defendant's Charleston location provides environmental sales and services, including the facilitation of cleaning services, to its customers.  See id. at 27.  When asked to describe the lines of business conducted at the Charleston branch, plaintiff responded: "[p]arts washer, sales, and service. Oil collection. Oily water collection. Vacuum sales and service. Antifreeze sales and service. And absorbents."  Id. at 27:5-7.

Steven Arthur ("Arthur") was an employee at the Charleston branch who worked under plaintiff's management.  See Arthur Dep. at 10.  Russell Pauly ("Pauly") was defendant's regional manager who oversaw the Charleston branch.  See Pauly Dep. at 5-6.  Pauly reported to Todd Rohde ("Rohde"), defendant's Divisional Vice President.  Rohde Dep. at 7:4-7.  Rohde reported to defendant's Executive Vice President of Sales, Dennis Wolff ("Wolff").  Wolff Dep. at 4.  Randy Schoemann

("Schoemann") was the Director of Internal Audit for defendant. Schoemann Dep. at 5:1-11.  In that role, Schoemann was responsible for, among other things, enforcing corporate policy and conducting investigations.  Id. at 5:18-21.

All employees of defendant received at the onset of their employment defendant's Code of Business Conduct and Ethics.  See Code of Business Conduct and Ethics, Def. Mem. Supp. ex. 1 (hereinafter "Ethics Code").  Plaintiff and Arthur both stated that they received the Ethics Code when they were hired and that it applied to them throughout their employment with defendant.  Pl. Dep. at 26:10-20; Arthur Dep. at 91:23-24, 92:1-6.

According to defendant's Ethics Code, "a conflict of interest may arise when an employee or member of their family receive improper personal benefits because of their position at the [defendant], such as entering into a contract with [defendant]."  Ethics Code; Termination Letter; see also Pl. Dep. at 28.  The Ethics Code included approval requirements for potential conflicts of interest:

> Employees must . . . obtain prior approval from the Chief Executive Officer or Chief Financial Officer prior to engaging in any transaction as described in this section.

Id.; Termination Letter; see also Pl. Dep. at 30:19-23.

3

Prior to his termination, plaintiff discussed with his supervisor, Pauly, and other colleagues his idea to form an entity that he would call Steam Works that could be operated by plaintiff's teenage sons to clean trucks, including, potentially, defendant's trucks.  Pl. Dep. at 33:4-7; 34:1-12; 37:3-6, 40:7-11, 14-16.

Twice during his deposition, Plaintiff recounted a conversation among plaintiff, Pauly, and the branch manager of defendant's Richmond, Virginia branch, Shane Reeves ("Reeves"), about plaintiff's desire to help his sons create a power washing cleaning business as well as plaintiff's desire that defendant's trucks be cleaned.[1]  Id. at 33:4-7; 34:1-12; 37:3-6; 91:5-21. The conversation occurred during a dinner in Richmond at some time in 2022.  Id. at 36:19-20.  Reeves explained that he and his sons had set up a grass cutting business, and "the first contract they ever got was to cut the [grass] at [defendant's]

---

[1] Inasmuch as the parties use the terms "power washing" and "pressure washing" interchangeably, the court herein considers the terms synonymous.  See e.g., Pauly Dep at 44:15-24. Plaintiff clarified in his deposition that the types of power washer or pressure washer used by defendant and by Steam Works would be heavy duty equipment and different from the type that "you and I have at the house maybe to do our own car or sidewalk" or "what you and I would buy at Lowe's."  Id. at 69: 13-19.  He stated that the heavy-duty power washers or pressure washers would be used to clean "pipes and hoses for oil trucks and vac trucks [that] would get just disgusting."  Id. at 70:1-2.

Richmond branch." <u>Id.</u> at 36:14-24, 37:1-24, 40:3-11.  Plaintiff recalled Pauly's explanation that defendant considered third-party contracts using a bid system:

> And I [plaintiff] said, "Well, how do you do that?  How do you start your first contract?  How do you know where to go?"
>
> And [Reeves] said, "Crystal Clean.  The first job I ever got was Crystal Clean."
>
> * * *
>
> "How did you get that approved?"
>
> [Pauly] said, "You send it out for a bid, and I'll take care of that for you."

<u>Id.</u> at 40:7-11, 14-16.

Plaintiff again recounted the conversation and reiterated Pauly's instruction and plaintiff's understanding that defendant's policy regarding third-party contracts required plaintiff to utilize a bid system and to seek approval from his superiors:

> And I'd already had a conversation with [Pauly] and [Reeves] going, "how did you get [defendant] to agree to let you cut your own grass?"
>
> And [Pauly] said, "Well, we sent that out. We get bids."
>
> I said, "Well [Pauly], I don't want anything to do with that. I'm not going to award myself a bid for anything."
>
> [Pauly] goes, "I'll do that for you. And then if you're the lowest bid, you're the lowest bid."

> I said, "Okay."
>
> So if that had happened, which it didn't, then
> that would have changed the look, and feel, and tone,
> and tenor of what Steam Works might have been.

Id. at 91:5-21.

Prior to plaintiff's registration of Steam Works with the West Virginia Secretary of State, which did not occur until March 29, 2023,[2] id. at 44:3-18, and presumably in anticipation of forming Steam Works, plaintiff learned in 2022 from Pauly and Reeves that defendant owned a discarded utility trailer and power washing equipment that plaintiff then purchased for $200 or $300 from defendant, see Bill of Sale and Standard Terms and Conditions of Sale, Pl. Resp. ex. 8, (hereinafter "Bill of Sale"); see also Pl. Dep. at 40-43.  The trailer and power washer were located at defendant's Richmond, Virginia location, so plaintiff instructed Arthur, who worked for him at the Charleston branch, to drive to Richmond to obtain the items and bring them back to Charleston.  Arthur Dep. 47:20-21, 48:4-7. According to Arthur, he put new tires on the trailer and completed the trip to and from Richmond "a few weeks before the

---

[2] The registration documents for Steam Works, LLC were not included as part of the record, but the contents of those documents, which are undisputed, were read into the record during plaintiff's deposition.  See Pl. Dep. 45-46.

[Service Wire] job" which occurred on March 13, 2023.  Arthur Dep. at 47:16-19.

Plaintiff wrote a check dated March 22, 2023, for $200, to defendant for the items.  See photograph, Pl. Resp. ex. 10.  Plaintiff's employment was terminated, effective April 7, 2023. See Termination Letter.  The sale purports to be memorialized by the Bill of Sale by defendant to "Buyer . . . Mike Gray of "Equipment . . . 15 ft utility trailer" for $300, dated April 28, 2023 and signed on behalf of defendant by Mark DeVita, Authorized Agent, but not signed on the appointed line by "Buyer . . . Mike Gray, Authorized Agent."  Presumably, the trailer included the power washer.  See Bill of Sale.

Service Wire is a customer of defendant that contacted Arthur seeking defendant's services for an on-site emergency vacuum and power washing job that needed to be done while the Service Wire equipment was shut down for 24 hours.  Pl. Dep. at 85; Arthur Dep. at 37:22-24, 38:1-15.  After the Service Wire job was completed, plaintiff submitted an invoice to defendant for the job in the company name of "Steamworks" on March 21, 2023.[3]  See Invoice #03132023001, Pl. Resp. ex. 4 (hereinafter

---

[3] The invoice reflects the name "Steamworks."  The names Steam Works (two words) and Steamworks (one word) are used interchangeably at different points throughout the record.  See e.g., Rohde Dep. at 74:14; Wolff Dep. at 70:16.  It is

"Invoice").  Upon receipt of the invoice, defendant generated an expense report for the Service Wire job.  <u>See</u> Mike Gray Expense report for Service Wire #22003, Pl. Resp. ex. 6 (hereinafter "Expense Report").  The date of the Service Wire job is memorialized on the Expense Report which includes the description "for Service Wire Vac job ran Monday 13 March 2023." <u>Id.</u>

Arthur explained that he had an established relationship with Service Wire, so Service Wire contacted him directly about their need for a machine to be "washed out and vac-ed out, sprayed out, things like that.  They needed a pressure washer that was mobile."  <u>Id.</u> at 38:6-8, 19-24, 39:1. He later explained that the power washing job at Service Wire was "a first-time gig," indicating he had not performed this work for the customer before.  <u>Id.</u> at 42:24.

Arthur contacted his supervisor, plaintiff, who was out of town for a business trip at the time of the Service Wire request, and they discussed over the phone the request for an emergency power washing job.  <u>Id.</u> at 38:18-24, 19:1-13.

undisputed that references to Steamworks and Steam Works are to the same entity, which was not yet a legal entity at the time of the Service Wire job.  For clarity, the court refers to it as "Steam Works," unless quoting directly from the record.

Inasmuch as the defendant did not own power washers, and in accordance with defendant's company practice of entering into third-party contracts to perform work that defendant could not perform independently, the Service Wire job required defendant to utilize equipment owned by a third party for power washing services, and the contract for that third party equipment required defendant's approval.  See id. at 39-40; see Pl. Dep. 88; see Pauly Dep. 32.  Performance for a customer under a third-party contract would result in an additional charge on the customer's final bill from defendant to include defendant's charges plus the cost of the third-party work.  See Pl. Dep. at 87:4-24.  Plaintiff explained that the approval process for third-party vendors required plaintiff to contact the regional manager for field services who would then find a vendor who could perform the work requested by the customer. Id. at 88:1-21.  Defendant's purpose for requiring contracts and proper approval for third parties to conduct work for defendant was to ensure that the third party had proper insurance and qualifications.  See Pauly Dep. at 61-63, 55:11-25, 56:1-19.

The regional manager for field services was on vacation at the time of the Service Wire request, so plaintiff could not contact him to initiate a search for a third-party to complete the Service Wire power washing job.  See Pl. Dep at

88:1-24, 89:2.  Plaintiff contacted his supervisor, Pauly, for general approval to complete the job.  Id. at 89:12-24.  Pauly and plaintiff did not discuss plaintiff or Arthur conducting the job using plaintiff's equipment, and plaintiff did not seek approval to complete the job using his personal equipment or his side business.  Id. at 90:1-21.  Plaintiff explained throughout his deposition his understanding that defendant engaged third party contracts – and particularly those entered into with employees' personal businesses – using a bid system.  See e.g., Pl. Dep. at 40:3-22, 91:5-21.  Pauly instructed plaintiff to "go rent one."  Id. at 90:2, 92:21-22.  When asked if he had made any effort to rent a power washer, plaintiff replied, "No. I never made the effort."  Id. at 94:24.

Pauly and plaintiff describe their conversation wherein Pauly instructed plaintiff to "go rent" a power washer, and plaintiff stated, "I know a guy that's got one of those [power washers]".  Pl. Dep. at 93:23-24, 94:1; see also Pauly Dep at 61:14-21.  Plaintiff asserts that he and Pauly laughed after Pauly made that statement, and plaintiff interpreted the comment and laugh as permission to use his own pressure washer to complete the Service Wire job.  See id. at 93-94.  Pauly confirmed plaintiff's recollection of the conversation and stated that plaintiff's pressure washer "didn't even come to

mind . . . I had totally forgot, and that didn't even come to mind that he [plaintiff] was the guy that had one." Pauly Dep. at 61:19-25.

Plaintiff fails to show how his conversation with Pauly wherein Pauly approved the emergency job at Service Wire amounted to permission from Pauly that plaintiff could rent his own power washer or that he could forgo the bid system. By plaintiff's testimony, and given his tenure with defendant, plaintiff knew that he needed to obtain a bid or bids for a third party to conduct the Service Wire job. In no sense could the conversation between Pauly and plaintiff be construed as Pauly approving plaintiff to engaging in a contract with the company. This is especially clear given plaintiff's testimony that his conversations with Pauly about his desire to set up a power washing business were limited to plaintiff establishing the business for his teenage sons to clean trucks.

After Pauly approved defendant's Charleston branch to complete the Service Wire job using a rented power washer, plaintiff stated to Arthur, "we'll just use the one I've got" to complete the Service Wire job, and he instructed Arthur to pick up the power washer from plaintiff's home and to complete the Service Wire job. Id. at 97:23-24, 98:1-6. Arthur stated that plaintiff called and informed him that the Service Wire job was

approved, and to complete the job using plaintiff's power washer.  Arthur Dep. at 40:1.  Following his conversation with plaintiff in which plaintiff instructed Arthur to use plaintiff's power washer to complete the Service Wire job, Arthur picked up plaintiff's trailer and power washer from plaintiff's home, located in Red House in an adjoining county, using a truck that had been rented by and paid for by defendant, and completed the Service Wire job.  See Arthur Dep. at 39-42; see also Expense Report.  Arthur stated that he could not recall whether he returned the trailer and power washer to plaintiff's house after completion of the Service Wire job.  Id. at 50:21-22.

Arthur stated that the route from plaintiff's home was a fifteen-minute drive to Service Wire and that the job took four hours to complete.  Id. at 45:16-20; 43:19.  Presumably, travel is as much as 45 minutes from the Charleston Branch to Red House and an equal amount of time to return may also have been required.  Arthur testified that three Service Wire employees operated plaintiff's power washer while Arthur supervised.  Id. at 42:16-21, 43:6-22.  Arthur, who was paid by defendant on a commission basis, charged Service Wire that which the defendant asked to be charged but never received the

12

commission to which he was entitled therefor from defendant.
Id. at 42:21-24, 46:1-13.

Arthur stated that plaintiff never spoke to him about
the Service Wire job after it had been completed.  See id. at
51.  Arthur testified that plaintiff never asked him how long
the job took to complete or who operated the power washer, nor
did he discuss how much he intended to charge Service Wire for
the job, or any other billing information related to the job.
Id. at 51:7-24, 52:1-10.

On March 21, 2023, plaintiff submitted or caused to be
submitted an itemized invoice to defendant bearing the name
"Steamworks" and for the total amount of $2,250.00.  See
Invoice.  The line items on the invoice consisted of charges for
1) rental of equipment in the amount of $1,500; 2) labor of crew
at the rate of $100 per hour, a quantity of 6, for the amount of
$600.00; 3) miscellaneous: gas, diesel for equipment in the
amount of $85.00; and 4) a fuel surcharge in the amount of
$65.00.  Id.  The invoice also included a $135.00 sales tax
charge but it was not added into the total invoice charge of
$2,250.00.  Id.  The invoice bore the date March 21, 2023, and
the message "Thank you for choosing Steamworks! We are available
Monday through Friday 8am-5pm and Saturday by appointment."  See

13

invoice.   Plaintiff did not elaborate on how he calculated the
prices or rates listed on the invoice.

It is apparent from plaintiff's deposition testimony
that at the time of the Service Wire job, Steam Works had not
yet been registered with the West Virginia Secretary of State.
Plaintiff's use of the name "Steamworks" on his invoice to
defendant for the work done at Service Wire was at most an
instance in which the plaintiff was doing business as Steam
Works and, in effect, the defendant appropriately treated the
invoice as one from plaintiff.   See Expense Report.

Schoemann, who investigated employee misconduct for
defendant, explained in his deposition that he began an
investigation into plaintiff's conduct after he received a
series of emails[4] that suggested he "look into" the business
Steam Works and included attachments of photos from the Steam
Works Facebook page.   Schoemann Dep. at 11:15-23.   Plaintiff has
confirmed that he created a Facebook page reflecting the name
Steam Works, that he took before and after photos of defendant's
trucks which he had cleaned, and that he never received
permission from defendant to advertise his side business using

---

[4] The emails were not made part of the record.

14

defendant's trucks.  See photographs, Def. Mem. Supp. ex. 4; see also Pl. Dep. at 54-55, 59, 64, 71.

According to Schoemann, the emails were originally sent by one of defendant's employees to his superior, who forwarded the emails to Schoemann.  Id.  He did not specify a date when he received the emails, but given the timeline established by the record, they were received by Schoemann sometime after the Service Wire job on March 13, 2023, and before plaintiff received the Termination Letter dated April 3, 2023, which reflected an effective termination date of April 7, 2023.

As a result of the contents of the emails, Schoemann stated that he spoke with a Human Resources officer who worked for defendant's Human Resources department, and an investigation was opened on plaintiff through defendant's ethics investigation program called Ethics Point.  Id. at 11:24-25, 12:1-23. Schoemann then pursued an investigation into plaintiff's conduct.  See id.  Schoemann sent all of his notes to a Human Resources Generalist for defendant.  Id. at 25:15-18.

Schoemann gathered information by speaking with various employees of defendant including employees at the Charleston branch, members of the Human Resources department, and corporate executives.  Id. at 15:1-25, 16:1-11.  A member of

15

the Human Resources department confirmed to Schoemann that the phone number listed on Steam Works' Facebook page matched the personal cell phone number in plaintiff's personnel file.  <u>Id.</u> at 16:6-8.

During the course of his investigation, Schoemann also learned about two instances regarding defendant's customers, Turnkey and Astorg, and became suspicious of plaintiff's handling of the matters.  <u>Id.</u> at 13:21-25, 14:1-25.  Schoemann added the Turnkey and Astorg incidents to his investigation.[5]  <u>Id.</u>

After Schoemann completed his investigation into plaintiff's conduct, he relayed his findings to Rohde and Wolff. The three had a telephone discussion wherein they "talked about the three things [presumably the Service Wire, Turnkey, and Astorg incidents] and we all agreed we were going to terminate his employment."  Rohde Dep. at 119:21-24.  Rohde and Wolff contacted defendant's Human Resources department and sought

---

[5] The Astorg and Turnkey are described inconsistently throughout the record and in the briefings by the parties, so it is unclear which facts related to which customer, and no dates were provided to describe the events.  <u>See</u> Pl. Dep. at 128-139; <u>see also</u> Schoemann Dep. at 70:5-18.  The events involved 1) the mishandling of a tote of waste, and 2) the mishandling of paperwork.

approval to terminate plaintiff's employment, which approval was granted.  <u>See</u> Rohde Dep. at 90; <u>see also</u> Wolff Dep. at 21-22.

Plaintiff states that he received two separate phone calls on the day he learned his employment was being terminated.[6] Plaintiff first received a phone call from Rohde and Wolff wherein they inquired of plaintiff about his role in the Turnkey and Astorg incidents; they did not alert him of their intention to terminate his employment for any reason during the first phone call.  <u>See</u> Pl. Dep. at 141.  Plaintiff received a second phone call from Rohde and Wolff, the decision-makers, later that same day wherein they informed plaintiff that he was being terminated from employment with defendant.  <u>Id.</u>  Rohde and Wolff limited this second termination phone call to discussion of plaintiff's use of his power washer and his side business to complete the Service Wire job.  <u>Id.</u>  Plaintiff described the contents of the termination phone call:

> It was very short and to the point . . . it was short and sweet, "We have decided that you did – you had a business outside of Crystal Clean and you didn't tell us about it. And we thank you for your years of service." And that was about all I remember out of the whole conversation.

---

[6] The date was not made a part of the record, though it occurred sometime between the date plaintiff submitted the invoice for the Service Wire job, March 21, 2023, and the date of plaintiff's termination letter, April 3, 2023.

Pl. Dep. at 143: 8, 14-18.

Plaintiff later received the Termination Letter which reflected violations of defendant's Ethics Code related to plaintiff's conduct regarding the Service Wire incident.  The parties seem to mistakenly assert in their briefing that the Turnkey and Astorg incidents had some bearing on plaintiff's termination, but it is clear from the evidence in the record that the only reason defendant provided to plaintiff for his termination in both the termination phone call and subsequent Termination Letter was plaintiff's violation of the Ethics Code by his conduct of orchestrating the Service Wire job to be completed with his power washing equipment.

## II.   Procedural History

Plaintiff filed this case in the Circuit Court of Kanawha County, West Virginia, on July 12, 2023.  See Compl. Defendant removed the case pursuant to the court's diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiff is a West Virginia resident, see id. at ¶ 2, and defendant is an Indiana company with its headquarters and principal place of business in Illinois, Notice of Removal at ¶ 8.  Defendant asserted in the notice of removal that a reasonable reading of the complaint establishes, by a preponderance of the evidence, an amount of

18

controversy in excess of $75,000.  <u>Id.</u> at ¶ 21.  The amount in controversy is not contended.

Plaintiff alleges in his complaint age discrimination, disability discrimination, and retaliation, related to his employment termination, in violation of the West Virginia Human Rights Act ("WVHRA").  <u>See</u> Compl.

Defendant moves for summary judgment, asserting, as a threshold matter, that the WVHRA does not apply to the defendant because it does not constitute an "employer" under the WVHRA definition of that term.  <u>See</u> Def. Mot. Summ. J.  Defendant alternatively asserts that, if the WVHRA applies to defendant, then the court should nevertheless grant its motion for summary judgment because plaintiff has not produced evidence that rebuts the legitimate reasons that defendant provided to support plaintiff's termination.  <u>Id.</u>  Plaintiff disputes the defendant's assertions.  <u>See</u> Pl. Resp.

Defendant further asserts that it is entitled to summary judgment on its counterclaim against plaintiff alleging plaintiff's breach of a duty of loyalty to defendant.  <u>Id.</u>

### III. <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

19

movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Courts at this stage do not resolve disputed
facts, weigh evidence, or make determinations of credibility.
See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir.
1995); Sosebee v. Murphy, 797, F.2d 179, 182 (4th Cir. 1986).
"Material" facts are those necessary to establish the elements
of a party's cause of action.  See Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986); see also The News & Observer
Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576
(4th Cir. 2010).  A dispute of material facts is "genuine" if,
in viewing the record and all reasonable inferences drawn
therefrom in the light most favorable to the non-moving party, a
reasonable fact-finder could return a verdict for the non-moving
party.  See Anderson, 477 U.S. at 248.  The moving party is
entitled to summary judgment if the record, as a whole, could
not lead a trier of fact to find for the non-moving party.  See
Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

     "[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact."  Anderson, 477 U.S.
at 247–48.  "[A] party opposing a properly supported motion for
summary judgment 'may not rest upon the mere allegations or
denials of his pleading, but . . . must set forth specific facts

showing that there is a genuine issue for trial.'"  Id. at 248

(quoting First Nat'l Bank of Ariz. v. City Servs. Co., 391 U.S.

253 (1968) (quoting Fed. R. Civ. P. 56(e)); see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 (1986)

(the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts").  A non-

movant who "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial" will

lose at summary judgment because "the nonmoving party has failed

to make a sufficient showing on an essential element of her case

with respect to which she has the burden of proof." Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).

IV.  **Discussion**

A. **Applicability of the WVHRA**

Defendant asserts that it is entitled to summary

judgment for all of plaintiff's claims because it contends the

WVHRA does not apply to defendant.[7]  Specifically, defendant

---

[7] Throughout the briefing, plaintiff and defendant erroneously
cite to a repealed section of the Human Rights Commission, West
Virginia Code § 5-11-1 et seq., Repealed by Acts 2024 c. 208,
eff. Feb. 8, 2024, that has been replaced by § 16B-17-1 et seq.
Defendant only cites to repealed sections, while plaintiff cites
to the current Code section only once, when quoting the
definition of "employer," then reverts to reference to repealed
Code sections.

asserts that it does not fit the definition of "employer" under the Act.

"The term 'employer' means . . . any person employing twelve or more persons within the state for twenty or more calendar weeks in the calendar year in which the act of discrimination allegedly took place."  W. Va. Code § 16B-17-3(d) (2024).

By declaration, defendant's Vice President of Human Resources, Chris Gordon, stated that "[defendant] has not employed 12 or more employees in the state of West Virginia for 20 or more weeks in 2023, 2022, or 2021."  Decl. of Chris Gordon at ¶ 5.  Gordon included an employee census for West Virginia as an exhibit to his declaration which appears to support his position.  Id. at Ex. 1.  He also stated that the only employees who work in West Virginia work for the Charleston branch.  Id. at ¶ 4.

Plaintiff disputes defendant's position and submitted an affidavit by which he asserted that twelve or more employees worked for defendant for twenty or more weeks in both 2023 and the preceding year 2022, and he listed twelve employees by name and job title.  See Pl. Aff. at ¶ 5-6.  He also included the names and job descriptions of employees who he claims oversaw the Charleston, West Virginia branch or who covered territory in

22

West Virginia and should be considered as being employed by defendant within West Virginia during the relevant years.  <u>See id.</u>

Pursuant to 28 U.S.C. § 1746, a declaration has the same force and effect as an affidavit. The court must take allegations in a complaint as true, except where the facts are controverted by a defendant's affidavit.  <u>See Wolf v. Richmond Cty. Hosp. Auth.</u>, 745 F.2d 904, 907 (4th Cir. 1984) (citing <u>Black v. Acme Mkts, Inc.</u>, 564 F.2d 681, 683, n. 3 (5th Cir. 1977)).

The information contained in Chris Gordon's declaration and plaintiff's affidavit conflicts as to the number of employees who worked for defendant during the relevant years. The conflict creates a genuine issue of material fact for which determination is improper at this stage.

Thus, the court proceeds to defendant's alternate arguments that plaintiff fails to establish claims of age or disability discrimination or retaliation.

B. <u>Discrimination Under the West Virginia Human Rights Act</u>

        Plaintiff alleges age and disability discrimination in violation of the WVHRA.  <u>See</u> W. Va. Code § 16b-17-1 <u>et</u> <u>seq.</u>  The Act prohibits employers from "exclud[ing] from, or fail[ing] or refus[ing] to extend to, a person equal opportunities because of . . . age . . . [or] disability . . . ."  § 16b-17-3(h).  Plaintiff also alleges retaliation in violation of the WVHRA.  <u>See</u> § 16B-17-9(6)(A) ("It shall be an unlawful discriminatory practice . . . [f]or any . . . employer . . . to . . . [e]ngage in any form of . . . reprisal.").

        The Supreme Court of Appeals of West Virginia has consistently held that cases brought under the WVHRA are governed by the same analytical framework and structures developed under Title VII, where statutory language does not direct otherwise.  <u>See</u> <u>e.g.</u> <u>W. Va. Univ. v. Decker</u>, 191 W. Va. 567 (1994).

        The framework is set forth in <u>McDonnell Douglas Corp.</u> <u>v. Green</u>, 411 U.S. 792, 801 (1973).  Under that burden shifting framework, a plaintiff must first establish a <u>prima</u> <u>facie</u> case.  <u>See</u> <u>e.g.</u>, <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993).

The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action.  Id. at 506.  Finally, the plaintiff is accorded an opportunity to demonstrate that inter alia, age or disability was a determinative factor in the defendant's employment decision or that the defendant's articulated rationale was merely a pretext for discrimination. See id.

Pretext may be shown through direct or circumstantial evidence of discrimination.  If the plaintiff fails to come forward with evidence rebutting the defendant's explanation, then the defendant may be entitled to summary judgment.  See Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981).

"In order to make a prima facie case of employment discrimination under the [WVHRA] . . . the plaintiff must offer proof of the following: (1) That the plaintiff is a member of a protected class[;][8] (2) That the employer made an adverse

---

8 The WVHRA states that the term "age" means the age of 40 or above, and "disability" means: "(1) A mental or physical impairment which substantially limits one or more of such person's major life activities. The term 'major life activities' includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working; (2) A record of such impairment; or (3) Being regarded as having such an impairment."  W. Va. Code § 16b-17-3(k), (m).

decision concerning the plaintiff[; and] (3) But for the plaintiff's protected status, the adverse decision would not have been made." Syl. Pt. 3, Conaway v. Eastern Assoc. Coal Corp., 178 W. Va. 164, 166 (1986).

The Supreme Court of Appeals of West Virginia has tempered the third component of the prima facie case, stating, "Use of the 'but for' language in [the Conaway] test may have been unfortunate, at least if it connotes that a plaintiff must establish anything more than an inference of discrimination to make out a prima facie case." Barefoot v. Sundale Nursing Home, 193 W. Va. 475, 486, 457 S.E.2d 152, 160 (1995). This inference can be shown by adducing evidence that (1) the plaintiff was a member of a protected class; (2) he provided competent, capable, and loyal service to his employer; (3) he was discharged from employment; and (4) he was replaced by someone not of his protected class. See Barefoot at 485; see also Prater v. Henry Schein, Inc., 621 F. Supp 2d 363 (S.D.W. Va. 2008) ("To determine whether Plaintiff can establish the necessary inference of discrimination, the Court applies the four considerations discussed in Barefoot.").

The Fourth Circuit has held that summary judgment is appropriate where a plaintiff fails to establish a prima facie case. Wilson v. Cir. City Stores, Inc., 81 F.3d 153 (4th Cir.

26

1996) (upholding summary judgment where a plaintiff failed to establish a prima facie case of discrimination on the basis of race). If a plaintiff establishes a prima facie case, summary judgment may still be appropriate if the defendant can show a legitimate, nondiscriminatory reason for the decision. Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir. 1995) (upholding summary judgment where a female plaintiff established a prima facie case of gender discrimination, but the defendant-employer rebutted the presumption).

i. Age Discrimination

It is undisputed that plaintiff was 55 years old and thus a member of a protected class under West Virginia Code section 16b-17-3(k) at the time defendant terminated his employment. Pauley, plaintiff's supervisor, stated in his deposition that plaintiff was performing well as a branch manager and that Pauley had no problems with plaintiff's performance prior to the events leading to plaintiff's termination. Pauley Dep. at 10-11. Similarly, Wolff stated that plaintiff was a good leader and was respectful, and he created good growth in the branch. Wolff Dep. at 6-8. Defendant does not dispute that plaintiff's replacement was younger than 40. Inasmuch as the showing a plaintiff must make

as to the elements of the prima facie case establishment of discrimination in order to defeat a motion for summary judgment is de minimis, the court accepts plaintiff's proffered evidence and finds that plaintiff has established a prima facie case of age discrimination.  See Syl. Pt. 4, in part, Hanlon v. Chambers, 195 W. Va. 99, 102 (1995).

After the plaintiff has established his prima facie case, "the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action." Barefoot, 193 W. Va. at 483, 457 S.E.2d at 160 (citing St. Mary's Honor Ctr., 509 U.S. at 506). If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the plaintiff must show that the reason given by the defendant is pretextual.  Id. at 507.

Defendant presents as legitimate non-discriminatory reasons to justify plaintiff's termination that plaintiff violated defendant's Ethics Code when he "confirmed that [he] and/or his wife owned Steam Works," and "[i]t was also confirmed that [plaintiff] told Arthur to use [plaintiff's] power washer to complete the Service Wire job."  Def's Mot. Summ. J. at 9.

Defendant provided plaintiff with a Termination Letter wherein it noted that plaintiff had violated company policy and

28

quoted portions of the Ethics Code including those related to
conflicts of interest related to (1) receiving improper personal
benefits because of one's position at the company, such as
entering into a contract with the company, (2) conducting
impermissible outside employment, and (3) doing business with
the company, in violation of the Ethics Code.  <u>See</u> Termination
Letter.

    The relevant portions of defendant's Ethics Code as
quoted in the Termination Letter provide:

A conflict of interest occurs when personal interests
interfere in any way with interests of the Company.

- A conflict occurs when an Employee takes actions
  or has an interest that may make it difficult to
  perform their work for the Company objectively
  and effectively. A conflict of interest may also
  arise when an Employee, or members of their
  family, receive improper personal benefits
  because of their position at the Company, such as
  entering into a contract with the Company. A
  conflict of interest may not be obvious.
- Outside employment — While not encouraged,
  outside employment may sometimes be allowed,
  provided:
  - It does not create a conflict of interest;
  - It does not interfere with the Employee's
    performance and/or employment with the
    Company;
  - It does not involve working for a
    competitor; and,
  - It is expected that employment with the
    Company takes priority over outside
    employment.

"Doing business with the Company"

(a)   Any Employee, including their immediate
      family, who has a significant financial
      interest (greater than 5% ownership
      interest) in a major customer, vendor, or
      any competitor of the Company, must report
      this to their immediate supervisor for
      referral to the VP Human Resources, or
      Internal Audit Department.

(b)   Employees must also obtain prior
      written approval from the Company's Chief
      Executive Officer ("CEO") or Chief
      Financial Officer ("CFO") prior to engaging
      in any transaction as described in this
      section.

Termination Letter; see also Ethics Code at 2-3.

     The court accepts the defendant's facially plausible

reasons for terminating plaintiff based on the justifications

provided in the termination phone call and in the Termination

Letter – in particular, that plaintiff violated defendant's

Ethics Code by his conduct related to the Service Wire incident.

     "Of course, after the employer has set out his reason

for the decision, the employee [has] the chance to rebut the

employer's evidence with a showing that the stated reason was

merely a pretext for discriminatory motive."  Conaway, 358

S.E.2d at 430.  Plaintiff may carry this burden by showing that

the legitimate non-discriminatory reasons were implausible and,

therefore, pretextual.  See Barefoot, 457 S.E.2d at 164.

     In support of his position that defendant's legitimate

non-discriminatory reasons were merely pretext for a

discriminatory motive, plaintiff presents evidence that he was a successful and dutiful employee with no prior disciplinary problems.  He does not argue that the instances listed by defendant to justify his termination did not occur, but rather, that his behavior did not violate any company policies regarding these issues.

Specifically, plaintiff asserts that he did not create a conflict within the meaning of defendant's Ethics Code because he did not "receive improper personal benefits because of [his] position with [defendant]."  Pl. Resp. at 14.  Plaintiff asserts that neither he nor his family received improper personal benefits because the invoice he submitted from Steam Works for the Service Wire job was never paid.

It is clear that defendant's proffered reasons for terminating plaintiff were legitimate and nondiscriminatory by virtue of plaintiff's knowing violation of defendant's rules for which he received personal benefit which is at least a quantum meruit claim for the use of plaintiff's equipment for which he was undisputedly never compensated.  Plaintiff provided defendant with a service — the use of his power washer — for which they owe him compensation.  The fact that plaintiff has a claim against defendant for nonperformance establishes the prohibited benefit contemplated in defendant's Ethics Code.

Additionally, The Ethics Code does not specify that a person must accept financial incentive to receive improper personal benefit.  Indeed, the record shows that defendant permits its employees to enter into contracts with it through a bid system, and to receive payment for services if the employee's bid is selected.  The conflict arises when the employee benefits "because of their position at the Company." This is precisely the conflict that arose when plaintiff, in his capacity as branch manager, forewent the bid process and unilaterally selected his own business to perform the service requested by Service Wire.

It is undisputed that plaintiff owned the power washer and operated as a vendor to defendant, as evidenced by the invoice he submitted for the work completed at Service Wire. Plaintiff was thus bound by the relevant section of the Ethics Code, 4(b).  Inasmuch as the parties agree that Pauly would have had authority to grant plaintiff permission to complete the Service Wire job given the emergency nature of the request, see Wolff Dep. at 85:9-20, the court concludes that company practice did not require plaintiff to "obtain prior written approval from the Company's Chief Executive Officer ("CEO") or Chief Financial Officer ("CFO")" to abide by defendant's Ethics Code.  It is clear that plaintiff was required to obtain approval from Pauly or another superior to utilize his own power washer to complete

the Service Wire job, and no such permission was sought or obtained.

Plaintiff recounted twice during his deposition a conversation wherein Pauly and Reeves explained to plaintiff defendant's process of entering into a contract with a third-party business that was owned by an employee.  He clearly understood the policies and rules in place for such transactions, and he violated them through his conduct related to the Service Wire job.

Plaintiff argues that Pauly was aware of plaintiff's intended creation of Steam Works and approved its use for the Service Wire job.  Nothing supports plaintiff's contention that Pauly granted plaintiff permission to use his own equipment or Steam Works to complete the job.  This is especially true in light of Pauly and plaintiff's prior conversations about the requirement that plaintiff would need to submit a bid for Steam Works to do business with defendant.  Pauly's instruction that plaintiff "go rent" a power washer illustrated that Pauly intended that plaintiff rent a power washer, not use his own. While Pauly knew about plaintiff's desire to create a power washing company for his teenage sons, the record is clear that plaintiff did not obtain approval from defendant of a third-party contract to authorize plaintiff individually or doing business as Steam Works to perform the Service Wire job or any

power washing for defendant, which plaintiff acknowledged he understood to be the company policy for such transactions.

Instead, plaintiff, who was on business out of town at the time, instructed his subordinate, Arthur, that the Service Wire job had been approved by defendant, to use a truck rented by defendant to pick up plaintiff's personally owned equipment at plaintiff's house, and to complete the Service Wire job using that equipment. Plaintiff then invoiced defendant for the work completed by Arthur — whom defendant was already paying as an employee on a commission basis — and charged six hours of work for a total of $600 for a job that Arthur stated took four hours to complete on the scene, coupled with his travel time that may have totaled two hours.

Plaintiff argues that defendant's discriminatory motive based on age is revealed by various comments plaintiff claims he heard from members of management. These unsubstantiated comments are self-serving; nothing in the record supports the contention that defendant's managers employed discriminatory practices or beliefs. Indeed, the only evidence plaintiff provided about another employee's termination based on age related to the termination and re-hiring of Steve Debord. Pl. Dep. at 152-153. Plaintiff stated that he "wasn't privy" to the conversations, but that he believed that Steve Debord was fired based on his age. Id. Plaintiff's hunch fails to support

34

his contention that defendant had a habit of terminating employees based on age.

Schoemann had never met plaintiff when he conducted the investigation into plaintiff's conduct.  Similarly, Rohde and Wolff stated that defendant's Human Resources department approved plaintiff's termination, and nothing suggests that members of that department were remotely involved in the discriminatory interactions about which plaintiff complains.

Finally, plaintiff's reliance on <u>Barefoot</u> is misplaced.  In that case, a Native American nursing assistant was terminated from her employment after allegedly striking a patient.  As proof of pretext, "the plaintiff offered evidence that other employees who were not members of the . . . protected class hit patients and were not discharged."  <u>Barefoot</u>, 457, S.E.2d at 162.  The plaintiff also offered "evidence that the employer had purged all other [Native American employees] from its workforce over a period of six to eight months."  <u>Id.</u>  The <u>Barefoot</u> court concluded that the evidence supported a conclusion that "the defendant's failure to discipline others for similar conduct evidenced pretext [] and [that] the defendant was on a mission to purge Native Americans from its workforce."  <u>Id.</u>

In contrast, the record in this case does not demonstrate disparate treatment of similarly situated branch

managers, the position occupied by plaintiff.  Despite some
suggestions by plaintiff and Arthur that other employees
committed misconduct but were not terminated, such suggestions
were vague and unsubstantiated.  When questioned about the
alleged disparate treatment, Arthur clarified that he had heard
rumors about misconduct by another branch manager in Louisville,
Kentucky who had not been terminated for the misconduct, but
Arthur could not say "how much of this is true and false" and he
"could not recall" whether defendant sanctioned the conduct
underlying the rumors.  Arthur Dep. at 92:20-21, 93:19-23.
Further, the record does not support plaintiff's assertion that
defendant had a settled purpose to "force[] out or terminate[]"
branch managers "[b]ecause they wanted new blood."  Pl. Dep.
150:9-12.  Plaintiff's claim is unpersuasive insofar as he was
over forty years of age when he was hired in 2011, and he was
subsequently promoted to branch manager.

Moreover, Arthur was younger than 40 years old when he
was fired for his participation in the Service Wire incident.
Defendant's evidence supports the position that the Service Wire
incident was an egregious violation of defendant's Ethics Code,
and Arthur was a less culpable employee acting under plaintiff's
direction and was terminated for his participation in the
incident.  Under these facts, defendant has shown the legitimacy

of its reasons for terminating plaintiff and the absence of a
discriminatory motive.

The defendant gives as its nondiscriminatory,
legitimate reason for terminating the plaintiff his failure to
abide by its Ethics Code, constituting a conflict of interest.
He did so in that he did business as a company he called Steam
Works, being a business outside the employment of the defendant,
without disclosing it.  And he did so by engaging his own
equipment in fulfilling the Service Wire contract that he caused
to be performed for his own improper personal benefit, using the
rental truck of the defendant and one of his subordinate
employees who was at the same time working on a commission basis
for the defendant, all without the approval of any one of his
supervisors, by virtue of which he billed the defendant for
$1,500 for the use of his own power washer and utility trailer.
The defendant knew nothing of Steam Works until defendant
received the invoice in the name of Steam Works for the Service
Wire project.

"[U]nless the employer has come forward with evidence
of a dispositive, nondiscriminatory reason as to which there is
no genuine issue and which no rational trier of fact could
reject, the conflict between the plaintiff's evidence
establishing a <u>prima</u> <u>facie</u> case and the employer's evidence of a
nondiscriminatory reason reflects a question of fact to be

37

resolved by the factfinder after trial." <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 203 (2nd Cir. 1995).

In light of plaintiff's violations of the Ethics Code and defendant's use of those violations as the basis for terminating plaintiff, the court determines that defendant has produced plausible, legitimate and non-discriminatory reasons for terminating plaintiff. Plaintiff has failed to adduce plausible evidence that would allow a reasonable jury to find that defendant's legitimate non-discriminatory reasons were pretextual as to age discrimination.

### ii. <u>Disability Discrimination</u>

Turing to plaintiff's argument that defendant engaged in disability discrimination against him, both the WVHRA and the federal Americans with Disabilities Act of 1990 (ADA) prohibit employment discrimination against a qualified individual with a disability. W. Va. Code § 16b-17-3(h); 42 U.S.C. §§ 12101-12213 (1990). The prohibition of disability discrimination extends to denial of employment opportunities based on the theories of disparate treatment and disparate impact. <u>Skaggs v. Elk Run Coal Co.</u>, 198 W. Va. 51, 63 (1996).

The disparate treatment model provides that an employer may not deny job opportunities to qualified individuals because of their disabilities. Thus, the

38

law protects persons with impairments from being
denied employment by virtue of an employer's hostility
to those who are disabled or its stereotypical
assumptions about their capabilities. See
e.g., Davidson v. Shoney's Big Boy Restaurant, 181 W.
Va. 65, 380 S.E.2d 232 (1989). In such cases, an
employer's animus determines its liability. The
disparate impact model bars an employer from relying
on employment criteria that disproportionately affect
a protected class but which are not job related. See
e.g., West Va. Univ./W. Va. Bd. of Regents v.
Decker, 191 W. Va. 567, 447 S.E.2d 259 (1994).

Id. In Skaggs, the court discussed the duty of employers under

the WVHRA to provide reasonable accommodations for employees

with known impairments to allow employees to perform the

essential functions of the job. Id. at 65. The court held:

To state a claim for breach of that duty, a plaintiff
may prove the following elements:

(1)  The plaintiff is a qualified person with a disability;

(2)  The employer was aware of the plaintiff's disability;

(3)  The plaintiff required an accommodation in order to
perform the essential functions of the job;

(4)  A reasonable accommodation existed that would meet the
plaintiff's needs;

(5)  The employer knew or should have known of the
plaintiff's needs and of the accommodation; and

(6)  The employer failed to provide the accommodation.

Id.

"An employer may defend against a claim of reasonable

accommodation by disputing any of the above elements." Id. at

66. Accordingly, if the defendant can show that a reasonable

jury could not find in favor of plaintiff on at least one of the
Skaggs elements, then summary judgment in favor of defendant is
appropriate.  See id.

Upon the following review of the record before it, the
court finds that plaintiff cannot show that defendant was aware
of any disability of plaintiff once he returned to work without
restrictions on January 2, 2023 or that defendant knew or should
have known of any need for an accommodation of plaintiff.

The court considers first whether plaintiff satisfies
the first prong of the McDonnell Douglas and Skaggs analyses,
that is, that he is a qualified person with a disability.
Plaintiff contends that he satisfies this requirement because he
underwent back surgery in the fall of 2022, several months
before his termination in April of 2023.  Pl. Resp. at 20; Pl.
Dep. at 157:17.

The term "disability" applies to a "physical
impairment which substantially limits one or more of a person's
major life activities. The term 'major life activities' includes
functions such as . . . performing manual tasks . . . and
working."  W. Va. Code § 16b-17-3(m)(1).  "Disability" can also
mean "[a] record of such impairment."  W. Va. Code § 16b-17-
3(m)(2).

The date of plaintiff's back surgery was not
established, but plaintiff provided a Doctor's note on

40

letterhead from St. Mary's Medical Center located in Huntington, West Virginia, indicating that he was seen by a nurse on November 29, 2022. <u>See</u> Letter from Unknown regarding M. Gray, Nov. 29, 2022, Pl.'s Resp. Ex. 19.  It is undisputed that the Doctor's note is related to a back surgery that plaintiff underwent on or before November 29, 2022.

The letter includes the following restrictions and accommodations:

> Mr. Gray may return to work on 11/30/22 with the following restrictions: no lifting more than 10 pounds, no bending, twisting or stooping and he may drive. Restrictions apply until 01/02/23 at which time he may work with no restrictions.

<u>Id.</u>

Since plaintiff was restricted at work and a record of his restrictions was memorialized in a doctor's note, the court assumes, <u>arguendo</u>, that plaintiff could establish at trial that he was disabled to the extent he was restricted by his doctor's orders.

Neither party contends that defendant failed to accommodate the restrictions contained in the Doctor's note. There are no facts to indicate that, after plaintiff's known restrictions ended and he returned to unrestricted work a month or so thereafter, that plaintiff informed defendant that he continued to suffer from a disability or that he requested an accommodation.

41

Indeed, plaintiff admitted that defendant accommodated his post-surgery restrictions by, for example, permitting him to work from home for a week after his surgery.  Pl. Dep. at 157:20-23.  Once plaintiff returned to the office, plaintiff described his at-work restrictions: "I couldn't drive. I couldn't lift more than three or four pounds. I couldn't walk or stand for long periods."  Id. at 159:9-11.  Plaintiff offers no facts to indicate that defendant failed to accommodate the restrictions contained in the Doctor's note or those he described in his deposition.

It is undisputed that plaintiff's restrictions related to his back injury ended on January 2, 2023.  See Doctor's note. His termination, which plaintiff believed occurred on April 3, 2023, based on the date on the Termination Letter, occurred 91 days later.[9]

It is held that three months is too tenuous to support a reasonable inference of causation.  Ali v. BC Architects Engineers, PLC, 832 F. App'x 167, 173 (4th Cir. 2020), as amended (Oct. 16, 2020) (citing Clark Cnty. Sch. Dist. v.

_____

[9] Plaintiff asserts that he believes his termination date was April 3, 2023 because that is the date reflected on the Termination Letter.  The Termination Letter instructs that plaintiff's termination was effective April 7, 2024.  The court accepts plaintiff's statement of his belief as true and conducts its analysis assuming that plaintiff's termination date was April 3, 2023.

42

Breeden, 532 U.S. 268, 273-74 (2001) (explaining that temporal proximity may suffice to establish causation when protected activity and adverse action are "very close.")).   In Ali, an employee of a company complained about racial discrimination three months before applying for a different position within the defendant company.   Id. at 173.   The court upheld the district court's dismissal of the plaintiff's discrimination claim because the defendant offered sufficient nondiscriminatory reasons for refusing to promote her.   Id. at 171.   When considering the plaintiff's retaliation claim, the Fourth Circuit determined that "the temporal proximity between that reporting and [the company's] failure to select her for the position is too tenuous to support a reasonable inference of causation."   Id.   The length of time does not inherently render the plaintiff's prima facie case unsuccessful, though "two months and two weeks" between a "complaint and the adverse employment action is sufficiently long as to weaken significantly the inference of causation between the two events."   King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003).   In King, the Fourth Circuit concluded that a plaintiff established a prima facie case of retaliatory discharge, but the defendant employer successfully rebutted the presumption of discrimination by showing it had legitimate, non-discriminatory

reasons for terminating the plaintiff, and the plaintiff offered no evidence of pretext.  Id. at 150.

Finding that plaintiff was temporarily disabled until January 2, 2023, and considering he was terminated three months later, plaintiff has failed to establish that defendant knew or should have known that he required accommodation beyond January 2, 2023.

The court declines to accept plaintiff's argument that an employer who learns that an employee underwent a surgery, for which the employer accommodated the employee to the extent of the employee's doctor's orders, should be treated as having knowledge that the employee is indefinitely disabled.

Though the WVHRA is separate from the ADA, "cases decided under the ADA are also helpful in deciding our cases under the [WVHRA]."  Hosaflook v. Consolidation Coal Co., 210 W. Va. 325, 479 S.E.2d 174, n. 10 (1997).  When analyzing the requirement that an employee inform an employer of a need for an accommodation, the Fourth Circuit has found, "[t]he burden to provide notice is not an onerous one: the employee does not need to mention the ADA or use the phrase 'reasonable accommodation,' but need only inform the employer of both the disability and the employee's need for an accommodation for that disability."

<u>Schneider v. Giant of Md., LLC</u>, 389 F. App'x. 263, 270 (4th Cir. 2010) (per curiam).

Nothing in plaintiff's evidence suggests that he put defendant on notice of a disability continuing from his back surgery after he was reasonably accommodated to the extent of his doctor's restrictions.  When asked whether his superiors who were aware of his back surgery had raised any problems about his initial restrictions, plaintiff responded, "Not in an official language or conversation."  Pl. Dep. at 164:6.  When plaintiff was asked whether he had any restrictions after he returned to his normal work duties, he replied, "No, not that I remember."  <u>Id.</u> at 159:20.  Defendant had no reason to question the explicit language contained in plaintiff's Doctor's note which stated that plaintiff's restrictions applied until January 2, 2023, "at which time he may work with no restrictions."

Plaintiff stated that he determined that defendant discriminated against him for his continued struggles after his back surgery based on "how [he] viewed it" and his opinion that he "was no longer the valued player that [he] had been before the surgery."  Pl. Dep. at 161:14-16.  The only proposed example of discrimination related to his back injury occurred when plaintiff travelled to Norfolk, Virginia for a business trip, but, aside from his explanation that he ordered a rideshare service to transport him to a restaurant while his colleagues

walked, plaintiff provided no evidence to support his
perspective that defendant knew or should have known that he
continued to struggle from his back surgery, that his challenges
amounted to a disability, or that they failed to accommodate his
needs.  See id. at 164-166.  Indeed, plaintiff could not recall
when the trip to Norfolk occurred, only that it "was one of the
first things I did after I was given permission to
drive . . . ."  Id. at 164:16-18.  Plaintiff was explicitly
permitted to drive throughout his recovery from his back
surgery. See Doctor's note ("he may drive.")  Even assuming
plaintiff believed he was restricted from driving, plaintiff
concedes that the events in Norfolk occurred soon after
plaintiff's restrictions were lifted.

　　　　Plaintiff also emphasizes two cryptic quotes found in
three handwritten notes, see Documents, Oct. 5, 2020, Pl.'s
Resp. Ex. 19., in plaintiff's personnel file that include
language that plaintiff believes is "sufficient to raise an
inference that [d]efendant viewed [plaintiff] as a liability due
to his physical condition and wanted him gone."  Pl's Resp. at
23.  While there is a lack of analysis by the parties with
respect to the relevancy of those three notes, the court finds
that the notes, two of which are dated October 5, 2020, and the
third of which is undated, reflect the following: On Monday
September 21, 2020, the plaintiff reported for work, after which

the plaintiff went to an emergency room and underwent
gallbladder surgery on September 23, 2020.  He then returned to
work on Monday October 5, 2020 and, inasmuch as it is noted,
"need Doctor's note," indicating his employer had not been
presented with a doctor's note that plaintiff could return to
work, his employer doubtless became fearful of being subjected
to what is next stated as "huge liability," as a result of
which, Jeff Shurtz, regional manager, gave the direction to "get
him out of branch today," and the plaintiff was accordingly
directed to go home.  None of the above quoted remarks, written
two and one-half years prior to his termination, has any bearing
on the issues in this case.  Moreover, Jeff Shurtz is not shown
to have had anything to do with the plaintiff's termination.
Indeed, he left the employment of the defendant about one year
after the October 5, 2020 notes were written.

        After careful review of the record, the court finds
that plaintiff fails to rebut, on grounds of disability
discrimination, defendant's legitimate reasons supporting its
decision to terminate plaintiff.

### iii. Retaliation

Plaintiff argues that defendant retaliated against him for requesting reasonable accommodation and/or leave, in violation of the WVHRA.[10]  See Pl.'s Resp. at 26.

To make out a prima facie case of retaliation, plaintiff must show (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action.  See King, 328 F.3d 145 at 150-51 (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)).

Assuming again that defendant was disabled as a result of his back surgery from the dates November 29, 2022 until his restrictions were lifted on January 2, 2023, and accepting the undisputed fact that plaintiff's employment was terminated, the court determines that plaintiff has satisfied prongs one and two of the analysis.

As to the third prong regarding a causal link between the protected activity and the asserted adverse action, plaintiff alleges that his termination three months after his restrictions related to his back surgery were lifted amounts to

---

[10] Plaintiff only alleges retaliation with regard to his disability claim.

an inference of retaliation.  Plaintiff offers no argument to support his contention but urges the court to accept his allegation simply because "just a couple of months after [plaintiff] returned to full-time duty his employment was terminated."  Pl. Resp. at 26.  He asserts that "[t]his proximity may lead to an inference of retaliation by a reasonable juror."  Id. at 26-27.

As stated, the lapse of three months, as in this case, is too tenuous to support a reasonable inference of causation. Ali, 832 F. App'x at 173.  While the Fourth Circuit clarified that the length of time does not inherently render the plaintiff's prima facie case unsuccessful, King, 328 F.3d at n.5, plaintiff presents no evidence or argument of a causal link between his disability and his termination.  Nor does he plausibly suggest that any accommodation was requested or needed during that period.  He simply asserts that he was disabled and terminated, and that those facts alone amount to evidence of retaliation.  Without more, and given the three-month lapse of time between the events, plaintiff has shown no causation between the two events.

## C. Summary

In addition to the foregoing, the plaintiff relies as well on mixed motive, coupling both alleged age and disability discrimination. Inasmuch as there is no genuine issue of material fact on any aspect of each the age and disability discrimination claim, as well as the retaliation claim, the court concludes that defendant's motion for summary judgment is granted as to all of those claims.

## D. Defendant's Counterclaim and Motion for Summary Judgment

Having determined that summary judgment should be entered for defendant on plaintiff's discrimination and retaliation claims, the court considers defendant's counterclaim by which defendant alleges that plaintiff breached his duty of loyalty to defendant.[11] Def. Mem. Supp. at 19. Defendant moves for summary judgment on the counterclaim. See Def. Mot. Summ. J.

Defendant alleges that plaintiff breached a duty of loyalty by self-dealing at the expense of defendant. Def. Mem. Supp. at 19. Specifically, defendant asserts that plaintiff

---

[11] The defendant-company is the counter-claimant, and the plaintiff-employee is the counter-defendant with regards to the counterclaim. To maintain clarity and consistency throughout this order, the court continues to refer to the counter-claimant as "defendant" and the counter-defendant as "plaintiff".

used defendant's property for his own personal advantage by using defendant's employees to create advertising materials for his personal business, having a subordinate employee travel out of state to pick up a power washer, and using an employee and its rented vehicle to transport the power washer to and from a job for plaintiff's profit.  See id. at 19-20.  Plaintiff opposes defendant's counterclaim, arguing that plaintiff never competed with defendant and that defendant was not harmed by plaintiff's conduct.  Pl.'s Resp. at 27-29.

Plaintiff, through counsel, did not cite caselaw in the briefing on this issue.  See Pl.'s Resp. at 27-29.  Instead, plaintiff conclusively asserts that "plaintiff in no way competed against the [d]efendant."  Id. at 27.  Plaintiff reiterates that Steam Works never bid on jobs in competition with defendant and points to Schoemann's testimony wherein he stated that the mere existence of Steam Works would not be a conflict of interest under the Ethics Code.  Id. (citing Schoemann Dep. at 34:12-16).

"[T]he first duty of the agent is to be loyal to his trust."  Timberline Four Seasons Resort Mgmt. Co. v. Herlan, 223 W. Va. 730, 739 (2009) (citing Moore v. Turner, 137 W. Va. 299, 316 (1952)).  Indeed, it is a general principle of agency that an agent or employee is bound to exercise the utmost good faith,

51

loyalty, and honesty toward his principal or employer.  <u>See</u> 3
Am. Jur.2d <u>Agency</u> §205.

An employee such as plaintiff who manages a branch of
a national company's business and possesses the decision-making
power to select and propose third-party bids to defendant has an
attendant fiduciary duty to use that power for the benefit of
the employer.  <u>See</u> <u>Pomeroy, Inc. v. Four Jaks. Inc.</u>, 11 Fed.
App'x. 275 (4th Cir. 2001) (unpublished).  Similarly, an
employee is prohibited from using an employer's property for
personal advantage and from deriving secret profits by virtue of
the employment relationship.  <u>Lucas v. United Fabricating, Inc.</u>,
Civ. Action No. 5:06-CV-154, 2007 U.S. Dist. LEXIS 64269, at
*14-15 (N.D.W. Va. Aug. 29, 2007).

As an employee of defendant, plaintiff owed fiduciary
obligations to his employer, and he breached those obligations
when he used his employment-related authority to direct his
personal business to defendant's customer, Service Wire, in
exchange for a demand for payment without notifying his employer
of this arrangement.  Conduct of this sort amounts to breach of
fiduciary obligations under West Virginia and common law
sources.  <u>See</u> <u>Gaston v. Wolfe</u>, 132 W. Va. 791, 797 (1949); <u>see
also</u> <u>Pomeroy, Inc.</u>, 11 Fed. App'x. 275 at *2 (<u>citing</u> Black's Law
Dictionary 340 (6th ed. 1990)).

52

As explained above, plaintiff's conduct of forgoing defendant's established protocol regarding third-party contracts amounts to a benefit to plaintiff who now has a quantum meruit claim for the use of his power washer inasmuch as plaintiff used his position as branch manager to unilaterally select and direct his own business as the third-party contractor to complete the Service Wire job.  Plaintiff derived personal advantage in the course of depriving defendant of its choice of qualified vendors and other possible competitors that it could trust to do without undue risk to defendant who routinely considers such matters as the insured status of third-party vendors.  Plaintiff understood defendant's bid system for third-party vendors and acknowledged that he submitted no bids for the Service Wire job.

Inasmuch as there is no genuine issue regarding plaintiff's breach of his duty of loyalty to defendant, summary judgment in favor of the defendant is appropriate.

V.    <u>Conclusion</u>

Based on the foregoing, defendant's motion for summary judgment on (1) plaintiff's claims against it under the WVHRA, and (2) its counterclaim against plaintiff for breach of loyalty, filed on July 12, 2024, is GRANTED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: October 31, 2024

_____
John T. Copenhaver, Jr.
Senior United States District Judge